UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZUBAIR SHAIKH,

                Plaintiff,

– against –

NATIONAL BANK OF PAKISTAN

                Defendants.

**OPINION & ORDER**

18 Civ. 3721 (ER)

RAMOS, D.J.:

      This suit concerns *pro se* Plaintiff Zubair Shaik's allegations that his former employer, the National Bank of Pakistan ("NBP"), terminated him because he disclosed alleged violations of sanctions law by NBP to the Office of Foreign Assets Control ("OFAC"). Now, following the close of discovery, during which Shaikh was assisted in taking depositions by counsel, NBP moves for summary judgment. NBP claims that the evidence shared during discovery establishes that it decided to terminate Shaikh before his report to OFAC, and therefore that it could not have terminated him because of his report, as is necessary to fall within the preview of the whistleblower protections of the Bank Secrecy Act ("BSA"), the one cause of action alleged in this action. For the reasons stated below, NBP's motion is GRANTED.

**I.    FACTUAL BACKGROUND**[1]

    A.    <u>Shaikh's Employment at NBP</u>

      NBP is a commercial bank predominantly owned by the state of Pakistan that operates a number of international branches, including one in New York City. (Doc. 64

---

[1] On January 31, 2020, Shaikh filed sur-replies in further opposition to NBP's motion for summary judgment. (*See* Docs. 81, 82.) Shaikh did not seek permission from the Court to file these documents, and the Court, therefore, declines to accept them pursuant to the Court's Individual Rules of Practice. *See* Rule II(B)(i) ("Unless prior permission has been granted, sur-reply memoranda will not be accepted.") In any

¶ 1; Doc. 72 ¶ 1.)  Shaikh began working in NBP's New York branch (NBP-NY) in 2006, initially in the Trade Finance Department.  (Doc. 64 ¶ 3; Doc. 72 ¶ 3.)  In 2010, Shaikh began working in the PakRemit Department, a department involved in processing remittances sent from customers in the United States to Pakistan.[2]  (Doc. 64 ¶ 4; Doc. 72 ¶ 4.)  Shaikh was the only employee working in the PakRemit Department.  (Doc. 64 ¶ 5; Doc. 72 ¶ 5.)

In January 2016, NBP decided to close the PakRemit Department effective March 31, 2016.[3]  (Doc. 64 ¶ 13.)  NBP gave PakRemit customers 30 days after the closure to contact NBP regarding customer service issues.[4]  (Doc. 64 ¶ 14.)  NBP witnesses testified that as a result of PakRemit's closure, Shaikh's role in PakRemit was eliminated.  (Doc. 65 ¶ 15.)

---

event, a cursory review of those sur-reply submissions suggest that they largely repeat arguments already made elsewhere in Shaikh's papers.

[2] NBP states that Shaikh was "transferred" to the PakRemit Department, suggesting that his position there was his primary one.  (Doc. 64 ¶ 4.)  Shaikh disputes this—he says his responsibilities in the PakRemit Department did not replace his job in the Trade Finance Department, that they were additive, and, in fact, were secondary to his responsibilities in the Trade Finance Department.  (Doc. 72 ¶ 4.)  As NBP notes, Shaikh does not cite to admissible evidence in his Rule 56.1 Statement, as is required by the Local Rules. While *pro se* litigants are "not excused from meeting the requirements of Local Rule 56.1," when a *pro se* plaintiffs "fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."  *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001).)  Here, Shaik's deposition testimony, cited by NBP, suggests that Shaikh retained responsibilities in the Trade Finance Department after he commenced working in the PakRemit Department, though it provides no basis to suggest that one assignment was secondary to the other.  (*See* Doc. 66-4 at 59:23-60:8.)

[3] Shaikh claims this fact is disputed because one NBP deponent, Syed Ahmad, the Chief Operations Officer in NBP-NBP, allegedly testified, according to Shaikh, "that he was not aware about the closing of the PakRemit department."  (Doc. 72 ¶ 13.)  The Court presumes, because Shaikh acknowledged in his deposition that the PakRemit Department closed on March 31, 2016 (Doc. 66-4 at 95:3-7), that Shaikh disputes not the date the Department closed but when the decision to close was made.  Ahmad testified that he did not "remember where and how [the decision to close PakRemit] was made" (though he testified that the matter was discussed and the decision made), but NBP's Country Manager for the Americas, Nasir Qureshi, testified that the decision was made in January 2016.  (Doc. 66-1 at 19:17-20; Doc. 66-5 at 70:21-71:3.)  Ahmad's deposition testimony does not contradict Qureshi's, and the Court finds no reason to find the fact disputed.

[4] Again, Shaikh states this fact is disputed.  He claims "[n]o written instruction was issued to [him]," but offers no evidence in support of that claim.  (Doc. 72 ¶ 14.)  Nor would this evidence, even if produced, affect the Court's analysis.  At least two deponents testified about this 30-day wind-down period.  (Doc. 66-2 at 81:18-22; Doc. 66-5 at 86-22:25.)

Shaikh had previously fulfilled back-up responsibilities in the Payments and Receipts ("P&R") Department on occasion, for example when a full-time P&R employee was on vacation. (Doc. 64 ¶ 16; Doc. 66-4 at 97 at 20-25.) According to NBP, NBP-NY management considered moving Shaikh into the P&R Department upon PakRemit's closure. (Doc. 64 ¶ 16.) Shaikh disputes these assertions, saying he was transferred out of the PakRemit Department, as well as the Trade Finance Department, on March 25, 2016, a few days before PakRemit closed. (Doc. 72 ¶ 15; Doc. 66-4 at 93:6-20.) The Court notes, however, that on April 29, 2016, Shaikh said in an email to Usman Aziz, NBP's Head of Human Resources for offices in the United States and Canada, that, as of the date of the email, he had "not received any official orders or instructions from the management to work in the P[&]R Department," and that on his supervisor's advice, he would continue to "help" the "P[&]R Department." (Doc. 69 at 109 of 117.) The email also notes that Shaikh had been instructed to act as "backup" to two employees. (*Id.*) Further, on April 19, 2016, Shaikh sent an email to a customer in which his email signature identified him as working in "PakRemit Customer Service." (Doc. 66-12 at D000174.)

Shaikh's employment at NBP ended on May 2, 2016, the first working day after the PakRemit wind-down period ended. Sometime after 5:00 p.m. that day, Aziz summoned Shaikh to Aziz's office, provided him a severance letter, and notified Shaikh that he had been terminated. (Doc. 64 ¶ 42; Doc. 72 ¶ 42; Doc. 66-2 at 124:21-24.) The severance letter stated that Shaikh was being terminated because his position became redundant after NBP ended the PakRemit product. (Doc. 69 at 101 of 117.)

B.     The March 16, 2016 Transaction

Shaikh's claims in this action arise out of events relating to a transaction on March 16, 2016, not long before his employment was terminated. That day, NBP's P&R Department released a $8,500 payment sent from NBP's branch in Dushanbe, Tajikistan. (Doc. 64 ¶ 19; Doc. 72 ¶ 19.) The payment was routed through NBP-NY and then issued

3

to Deutsche Bank. (*Id.*) When Deutsche Bank received the payment, it asked NBP-NY to provide additional information about the transaction, and NBP-NY in turn sent a message to the Dushanbe branch asking for this information. (Doc. 64 ¶ 20; Doc. 72 ¶ 20.) On March 25, 2016, the Dushanbe branch sent NBP-NY a message saying the payment was for transfer of photocopy paper from Bandar Abbas, an Iranian port. (Doc. 64 ¶ 21; Doc. 72 ¶ 21.) That same day, Shaikh came across the message. (Doc. 64 ¶ 22; Doc. 72 ¶ 22.) NBP claims Shaikh saw this message while performing back-up duties in the P&R Department; Shaikh says he had been transferred to the P&R Department full-time on this day. (*Id.*) In any event, all agree that Shaikh, upon seeing the message's mention of Iran, reported the transaction internally for OFAC review. (Doc. 64 ¶ 23; Doc. 72 ¶ 23.) The message was escalated to Joseph Conway, NBP-NY's Chief Compliance Officer. (Doc. 64 ¶ 24; Doc. 72 ¶ 24.) Conway consulted a "Frequently Asked Questions" resource about the Joint Comprehensive Plan of Action, popularly referred to as the Iran Deal, and determined that the transaction did not need to be reported to OFAC solely because it was transferred through Bandar Abbas.[5] (Doc. 64 ¶ 24; Doc. 66-6 at 115:10-15.)

On May 2, 2016 at 10:08 a.m., Shaikh sent an email from his NBP email address to OFAC reporting the transaction. (Doc. 64 ¶ 41; Doc. 72 ¶ 41.) The email said that upon learning of the March 16, 2016 transaction's connection with Iran, NBP-NY sent Deutsche Bank a message saying the transaction had been made "in error," not mentioning the connection with Iran, and requested that Deutsche Bank return the funds. (Doc. 69 at 115 of 117.) Shaikh wrote that he was bringing the matter to OFAC's attention because he believed NBP-NY "should have informed [Deutsche Bank] about the Iranian [n]exus" so that Deutsche Bank could, in turn, have informed OFAC. (*Id.*) Shaikh did not copy any NBP employee on the email, show the email to any NBP

---

[5] Shaikh claims this fact is disputed but concedes that he received no information about NBP's review after the transaction was escalated for Conway's review and cites no contradictory evidence. (Doc. 72 ¶ 24.)

4

employee, or tell any NBP employee that he had sent it. (Doc. 64 ¶ 41; Doc. 72 ¶ 41; *See also* Doc. 66-4 at 211:10-18.) While Shaikh does not provide evidence that any NBP employee was aware of his email to OFAC prior to his termination, indeed NBP deponents testified that they only became aware of the email after Shaikh's termination, he argues that he "fear[s] [NBP] became aware of my email" because Ahmad, NBP's COO, had access to employee email messages.[6] (Doc. 72 ¶ 41; Doc. 64 ¶ 41; *see also* 66-4 at 212:19-213:3.)

Shaikh cites no evidence for why he reported the transaction to OFAC, but argues that he did so "in good faith" and because he believed the transaction to be prohibited, when he "realized that they [were] trying to create trouble for" him, after they had "harassed" him "several times." (Doc. 72 ¶ 41.)

    C.     Events in April 2016

While Shaikh does not explain what exactly he means by the "trouble" "they" were creating for him, the Court infers that he may be referring to events that transpired in the period after Shaikh first reported the March 16, 2016 transaction and before his May 2, 2016 email to OFAC.

On April 6, 2016, Flor Bello, head of the P&R Department asked Sonja Leung, another P&R employee, to assign cases for Shaikh to review and to remind Shaikh to ensure his reports were properly completed.[7] (Doc. 64 ¶ 26.) Leung and Shaikh spoke that day. (Doc. 64 ¶ 27; Doc. 72 ¶ 27.) Bello, who was within earshot, testified that Shaikh yelled at Leung.[8] (Doc. 64 ¶ 27; Doc. 66-3 at 95:22-96:3.) Shaikh concedes that

---

[6] Shaikh also claims that he is "sure that Mr. Syed Ahmad was informed about [the email to OFAC] because he was frequently visiting to [*sic*] the office of the Country Manager," (Doc. 72 ¶ 43), but provides no admissible evidence in support of that contention, nor does he establish that Ahmad visited the Country Manager on May 2, 2016 (the day Shaikh both sent his email to OFAC and was terminated) or why the Country Manager would be aware of Shaikh's email to OFAC.

[7] Shaikh claims this fact is disputed, but it is not clear from his Rule 56.1 Statement what aspect of this statement he disputes. (Doc. 72 ¶ 26.) In any event, he cites no evidence for his contention.

[8] Other evidence, including Doc. 66-11, an April 13, 2016 from Bello to Ahmad, suggests that Shaikh's conversation with Leung was preceded by one between Shaikh and Bello that also became heated.

he yelled at Leung, though argues she also yelled at him.  (Doc. 66-4 at 203:18-204:12.)  He also testified that he told her, "You are not my boss.  You are not my supervisor or manager.  Please keep quiet."  (Doc. 66-4 189:17-21.)  Bello, who overheard the conversation, testified that she intervened and explained that Leung was following Bello's directions.  (Doc. 64 ¶ 27; Doc. 66-3 at 96:4-11.)

Bello testified that after this encounter, she called Ahmad, NBP's COO and Shaikh's supervisor, advised him that Ahmad was being disruptive and asked Ahmad to remove Shaikh from the workspace to calm him down.  (Doc. 64 ¶ 28; Doc. 66-3 at 96:19-104:22.)  Ahmad, Shaikh, and Bello spoke in Ahmad's office, and Ahmad told Shaikh that he had acted inappropriately in yelling.[9]  (Doc. 64 at ¶ 29.)  One week later, on April 13, 2016, Bello emailed Ahmad about the April 6 incident, stating that the purpose of the email was "to report the unpleasant incident involving Mr. Zubair Shaikh . . .."  (Doc. 64 ¶ 31; Doc. 66-11 at D00092.)  In the email, Bello said that when Shaikh was asked to mention all relevant details in initiating cases, he "reacted angrily," spoke in "a loud tone," and told Leung "to keep quite [sic] because she was not his boss."  (Doc. 66-11 at D00092.)  The email closed with a request "to please bring these matters to the attention of the Human Resources Department and Higher Management. . .") (*Id*. at D000093.)  That same day, Ahmad forwarded the email to Aziz, copying Nasir Qureshi, NBP's Country Manager for the Americas, and Bello, saying that he was doing so "in accordance with the Bank's H.R. Policy." (*Id*. at D00092.)

On April 21, 2016, Aziz forwarded Bello's April 13, 2016 email to Shaikh.  (Doc. 69 at 111 of 117.)  The email asked Shaikh to provide an explanation of the incident within seven days "to satisfy the complaint," and said that "based on [the] explanation, the Bank [would] decide whether or not to initiate disciplinary action against" Shaikh.

---

[9] In his papers, Shaikh insists that he was correct with regards to the substance of the dispute between him and Bello and Leung.  (Doc. 72 ¶ 27.)

6

(*Id.*)  Shaikh responded to the email on April 29, 2016, with a lengthy defense of his actions.  (Doc. 69 at 109 of 117-111 of 117.)

At his deposition, Ahmad testified that this was not the first time that Shaikh had reacted angrily at being told what to do, and had raised his voice at Ahmad before.  (Doc. 66-1 at 87:7-17, 88:10-18.)  In March 2015, Ahmad sent Shaikh a letter about an incident in which Shaikh, as alleged in the letter, "raised [his] voice and demanded a salary increase and promotion" when he was asked to fill-in for an employee who was traveling to Pakistan to care for his ailing brother."[10]  (Doc. 66-13; Doc. 64 ¶ 37.)  Ahmad testified, in effect, that after the April 6, 2016 incident, he had reached the end of his rope, and determined that, as the NBP-NY's Chief Operations Officer who "supervise[d] everybody," he could not work with Shaikh any longer.  (Doc. 64 ¶¶ 32; Doc. 66-1 at 89:18-90:15.)  Ahmad said he provided the "feedback" that Shaikh was a "lost cause" to the Human Resources Department.  (Doc. 66-1 at 89:20-22.)

Shaikh does not dispute the content of Ahmad's conversation with H.R.  (*See* Doc. 72 ¶ 32.)  Shaikh, however, does say Ahmad's characterization of his performance at NBP-NY is at odds with the generally positive performance review that was completed on April 11, 2016.  (Doc. 72 ¶ 32; Doc. 69 at 60 of 117-64 of 117.)  That performance review purported to cover Shaikh's employment in the PakRemit Department and as "backup for Trade Finance" during 2015.  (Doc. 69 at 60 of 117.)  It awarded Shaikh an overall score of 4.26 out of 5, 4 out of 5 for "maintain[ing] good professional working relationship and open communication with Managers and Co-workers," 3 out of 5 for "Communication Skills," and 4 out of 5 for "Attitude, Behavior & Response to Controlling Offices."  (Doc. 69 at 62 of 117.)  This performance review was signed by

---

[10] Shaikh defends his response to being asked to fill-in because he was already stretched thin and had no experience in the matters he was being asked to do, but he does not dispute that the letter was sent.  (Doc. 72 ¶ 37.)

7

Shaikh's supervisor after the April 6, 2016 incident, but before Bello's April 13, 2016 email.

On or before April 19, 2016, Aziz testified that he recommended to Qureshi that Shaikh's employment be terminated due to his behavior towards colleagues and Ahmad's decision that he no longer wanted to work with Shaikh. (Doc. 64 ¶ 33; Doc. 72 ¶ 33; Doc. 66-2 at 120:14-21.) Aziz testified that Qureshi agreed with the recommendation and told Aziz to write a memo memorializing the decision.[11] (Doc. 64 ¶ 33, Doc. 66-2 at 120:14-21.) On April 19, 2016, Aziz drafted a memo about the decision to terminate Shaikh. (Doc. 64 ¶ 38.) The memo says that Shaikh's services were no longer required after NBP ended the PakRemit program on March 31, 2016, and that while NBP "intended to place him in the Operations Department to handle the Payments & Receipts function[,] . . . due to his misbehavior with staff of the department, [NBP had] no choice but to terminate his services."[12] (Doc. 66-15.) A version of the memo was signed by Aziz, Qureshi, Ahmad, and a fourth individual. (Doc. 66-14.) The memo is dated April 19, 2016; a version of the document that appears to be in Microsoft Word format is produced with metadata suggesting that the document was created at 2:48 p.m. on April 19, 2016, last saved at 3:34 p.m. on April 19, 2016, and last printed at 3:13 p.m. on April 19, 2016; and at least one of the four people who signed the memo, Nasir Qureshi, said he did so on April 19, 2016.[13] (Doc. 66-14; Doc. 66-15; Doc. 66-5 at 92:3.) Qureshi testified that NBP decided that it would terminate Shaikh on May 2, 2016, the first

---

[11] Qureshi also testified that he was aware of previous incidents in which he said he "noticed [Shaikh's] temper," including at meetings that Qureshi attended. (Doc. 66-5 at 77:13-18.)

[12] Shaikh says that this memo was not shared with him and that at a conference before Judge Netburn on October 25, 2018, NBP's counsel admitted as much and said the memo had been put in Shaikh's personnel file. (Doc. 69 at 11 of 117.) Shaikh says this is a "violation of [a] natural principle of justice," but the Court is not aware of any rule that required NBP to provide this document to Shaikh before discovery. It is apparent from questioning at depositions that NBP provided Shaikh this document during discovery.

[13] The Court is not aware of evidence that any of the other signatories to the memo signed it on a different date.

business day after the end of the 30-day period after PakRemit's closure. (Doc. 64 ¶ 34; Doc. 66-5 at 86:18-88:3.)

NBP states in its Rule 56.1 Statement that on April 19, 2016, Aziz emailed Qureshi a draft severance agreement for Shaikh. (Doc. 64 ¶ 39.) While the evidence NBP points to does not establish that this email was sent (no email is provided), NBP does provide evidence of a document that appears to be a separation agreement. (Doc. 66-16.) According to the metadata provided for that document, it was created on April 19, 2016, and last saved on May 2, 2016 at 11:24 a.m., a little over an hour after Shaikh sent OFAC an email reporting the March 16, 2016 transaction.[14] (Doc. 66-16 at D000965.) From the information provided, the Court cannot tell the contents of the document as they existed on April 19, 2016.[15]

D. Other Information Provided

Shaikh contends that other facts are relevant to understanding his termination. Among others, he says that the NBP entered a consent order with the Federal Reserve Bank of New York and the New York State Department of Financial Services on March 14, 2016, which notes that the most recent examination of NBP-NY "identified deficiencies relating to the Branch's risk management and compliance with applicable federal and state laws, rules, and regulations relating to anti-money laundering compliance, including the Bank Secrecy Act. . .." (Doc. 69 at 21 of 117.) Shaikh contends that this consent order informed NBP senior management's frame of mind (Doc.

---

[14] The metadata lists Qureshi, not Aziz, as the document's author, but suggests that Aziz last saved the document. (Doc. 66-16 at D000965.)

[15] NBP also refers to an email interaction between Shaikh and a customer, also on April 19, 2016, in which Shaikh requested information from the customer "to make sure that the funds had not been sent to any Terrorist Group or Drug Traffickers." (Doc. 66-12.) The next day, Ahmad emailed Shaikh saying that "[a]s discussed yesterday, [Shaikh's] response . . . to the customer was inappropriate and could expose the bank to legal and regulatory issues." (*Id.*) NBP does not explain, however, if and how this exchange factored into its decision to terminate Shaikh, which NBP says was made before Shaikh sent his email to the customer. The Court notes that Shaikh's email to the customer was sent at 4:41 p.m. on April 19, after Aziz drafted the memo memorializing the decision to terminate Shaikh.

9

69 at 18 of 117.)  Shaikh also says that two prohibited transactions of $115 and $230 were released on January 30, 2014, for which NBP was allegedly fined $28,000 by OFAC in 2015, but provides no evidence for this claim.  (Doc. 69 at 5 of 117.)

Shaikh also notes other instances, besides those with regards to the March 16, 2016 transaction, in which he claims he raised compliance issues at NBP.  These include an occasion in 2012 with regards to alleged bugs in software (Doc. 69 at 4 of 117), as well as a transaction in mid-March 2016 for $300 for which Shaikh provides some sort of receipt with hand-markings, but it is not evident to the Court what issues Shaikh saw with the transaction or what he communicated to bank management about it (Doc. 69 at 5 of 117.).

## II.    LEGAL STANDARD

Summary judgment is only appropriate where the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, [and] other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)-(c).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, a motion for summary judgment cannot be defeated on the basis of conclusory assertions, speculation, or unsupported alternative explanations of facts. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *see also Senno*, 812 F. Supp. 2d at 467 (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson*, 477 U.S. at 256-57).

Nonetheless, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (internal citations omitted).

The Second Circuit has made clear that "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (citing *Sellers v. M.C. Floor Crafters, Inc.*,

842 F.2d 639, 642 (2d Cir. 1988)). *Pro se* litigants' submissions are "held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Young v. N.Y.C. Department of Education*, No. 09 Civ. 6621, 2010 WL 2776835, at *5 (S.D.N.Y. July 13, 2010) (noting that the same principles apply to briefs and opposition papers filed by pro se litigants). Although "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law,'" *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)), courts read the pleadings and opposition papers submitted by pro se litigants "liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (citation omitted). "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### III. DISCUSSION

#### A. The BSA's Whistleblower Protections

Shaikh's sole claim arises out of a provision of the Bank Secrecy Act, codified at 31 U.S.C. § 5328(a). The section provides:

> No financial institution or nonfinancial trade or business may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to the Secretary of the Treasury, the Attorney General, or any Federal supervisory agency regarding a possible violation of any provision of this subchapter or section 1956, 1957, or 1960 of title 18, or any regulation under any such provision, by the financial institution or nonfinancial trade or business or any director, officer, or employee of the financial institution or nonfinancial trade or business.

Section 5328(a) is therefore read to protect: "(1) employees of financial institutions who (2) provide information regarding a possible violation of specified laws and regulations by the financial institution, its directors, officers, or employees, to (3) the

Treasury Secretary, Attorney General, or 'any Federal supervisory agency,' from (4) [discharge or other] employment-related discrimination (5) because they made such a report." *Taft v. Agric. Bank of China Ltd.*, 156 F. Supp. 3d 407, 413 (S.D.N.Y. 2016).

Clear from the statutory text and case law is that only reports to the "Treasury Secretary, Attorney General, or any Federal supervisory agency" are protected by the BSA. *See* 31 U.S.C. § 5328(a); *Hill v. Mr. Money Fin. Co. & First Citizens Banc Corp.*, 309 F. App'x 950, 961 (6th Cir. 2009) (agreeing that a plaintiff is not protected if "the plaintiff did not report the relevant information, himself or through a conduit, to a federal banking agency, the Attorney General, the Secretary of the Treasury, or any federal supervisory agency."); *Hall v. Wells Fargo & Co.*, 17 Civ. 02465 (JGB), 2018 WL 6016143, at *5 (C.D. Cal. Feb. 22, 2018) (dismissing complaint where plaintiff did "not allege[] that she provided information to the Secretary of the Treasury, the Attorney General, or any Federal supervisory agency regarding a possible violation.") Internal complaints are therefore not protected by the BSA.

Further, courts in this District have previously held that absent "a showing that Congress intended to impose a more rigorous showing of causation for retaliation claims under the BSA, the Court assumes . . . [that] protected conduct need not be the sole cause of the adverse employment action to qualify as actionable retaliation, and such causation may be shown indirectly, by means of circumstantial evidence. *See Taft*, 156 F. Supp. 3d at 421.

    B.    <u>Shaikh's Claim</u>

The parties agree that Shaikh was an employee of a financial institution, that he was discharged, and that Shaikh's May 2, 2016 email to OFAC is the type of activity protected by the BSA. Where the parties disagree is whether NBP terminated Shaikh because of his May 2, 2016 email to OFAC. For Shaikh to prevail in this litigation he must establish that he was terminated because of his May 2, 2016 email.

To be clear, the Court need not make any determination about whether Shaikh was

13

a good or bad employee,[16] whether NBP's stated reasons for Shaikh's termination were indeed its true reasons, or indeed whether NBP terminated Shaikh because he reported potential problems internally within NBP. Because the sole claim in this litigation is an alleged violation of the whistleblower protections of the Bank Secrecy Act, the Court need only decide whether NBP terminated Shaikh because of his May 2, 2016 disclosure to OFAC.

Viewing the facts in the light most favorable to Shaikh, the Court concludes that no reasonable juror could find a causal connection between the May 2, 2016 email and Shaikh's termination.

The only evidence Shaikh cites that might support a finding of causation is that Shaikh was terminated on the same day he emailed OFAC. "Ordinarily, causality can be inferred from the fact that 'the protected activity was closely followed in time by the adverse action.'" *Young v. Westchester Cty. Dep't of Soc. Servs.*, 57 F. App'x 492, 495 (2d Cir. 2003) (quoting *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001). But, "where the adverse action was already ongoing at the time of the protected activity, or is very similar to another adverse action that was taken before the protected activity, with no other change in relevant circumstances, logic precludes any inference of causation." *Id.* (citing *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)).

Here, the evidence adduced establishes that NBP made the decision to terminate Shaikh days before his disclosure to OFAC. Aziz, NBP-NY's head of H.R., and Qureshi, NBP-NY's Country Manager for the Americas, both testified that the decision to terminate Shaikh after he was no longer needed in the PakRemit role was made on or before April 19, 2016. (Doc. 64 ¶ 33; Doc. 66-5 at 86:5-87:5, 92:2-7; Doc. 66-2 at 120:14-21.) This decision was memorialized in a memo, the face and associated

---

[16] Shaikh provides numerous documents suggesting that he received salary raises, promotions, and favorable performance reviews during his tenure at NBP.

metadata of which establish was written on April 19, 2016. (Doc. 66-15.) Qureshi also testified that he signed the memo on April 19, 2016. (Doc. 66-5 at 92:3; Doc. 66-14.) Shaikh speculates that these documents may have been "back dated," but provides no evidence for the claim. (*See* Doc. 69 at 15 of 117.) Indeed, confronted with the metadata indicating that the memo memorializing the termination decision was written on April 19, Shaikh concedes that he has "no information about it." (Doc. 72 ¶ 40.)

The evidence indicates that the wheels were already in motion to terminate Shaikh after the PakRemit Department's wind-down period ended. That Shaikh emailed his report to OFAC after preparations for his termination had commenced does not render the already-determined course unlawful.[17] *See Lopez v. City of New York*, No. 14 Civ. 3285 (NGG), 2016 WL 3129184, at *8 (E.D.N.Y. June 2, 2016) (finding no causation where "Defendant simply carried out [the] decision" after plaintiff engaged in the protected activity."); *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.")

Moreover, there is no evidence that anyone at NBP, other than Shaikh, was aware that he had emailed OFAC before he was terminated, further undermining a causal link between the events. *See Louden v. United Parcel Serv., Inc.*, 11 Civ. 3012 (KBF), 2013 WL 443534, at *6 (S.D.N.Y. Feb. 5, 2013) (no triable issue as to causal link between protected activity and termination where no one with authority knew about the complaint); *Paladino v. DHL Express (USA), Inc.*, 07 Civ. 1578 (DRH), 2010 WL 1257786, at *10 (E.D.N.Y. Mar. 26, 2010) ("It is, of course, elemental that an employer could not have discriminated against a plaintiff because of his disability if it was unaware

---

[17] Indeed, Shaikh's papers might reasonably be read to suggest that he was aware his termination or other negative employment action was coming and contacted OFAC for that reason, stating that he decided to email OFAC when he "realized that they are trying to create trouble for me." (Doc. 69 at 17 of 117.)

that the plaintiff was, in fact, disabled." (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n. 7, (2003)). Shaikh says that Ahmad was in charge of the IT Department so it would have been "very easy for him to monitor" Shaikh's emails and, therefore, Shaikh fears that NBP became aware of his email to OFAC in that manner. (Doc. 72 ¶ 41.) While a causal connection can be established by circumstantial evidence, *see Louden*, 2014 WL 443534 at * 6, Shaikh's rank speculation that NBP could have been aware of his email had they looked for it does not raise a triable issue of fact that they did, especially given the evidence that NBP planned to end Shaikh's employment after PakRemit's wind-down period and did so the day after that period ended.

Because NBP decided to terminate Shaikh before May 2, 2016 and because there is no evidence that NBP was even aware of Shaikh's disclosure to OFAC until after May 2, 2016, no reasonable juror could conclude that NBP terminated Shaikh because of his email to OFAC.

I.  **CONCLUSION**

For the foregoing reasons, NBP's motion for summary judgment is GRANTED.

The Clerk of the Court is respectfully directed to terminate the motion at Doc. 62 and close the case.

It is SO ORDERED.

Dated:   June 22, 2020
         New York, New York

                                                    _____
                                                    EDGARDO RAMOS, U.S.D.J.

16